# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:21-mj-00436** |
| | : | **Chief Judge Beryl A. Howell** |
| **SEAN MICHAEL MCHUGH,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REVIEW MAGISTRATE JUDGE'S DETENTION DECISION

The United States of America, through the undersigned, submits this Response in Opposition to Defendant's Motion to Review Magistrate Judge's Detention Decision ("Defendant's Motion"). The United States opposes the Defendant's Motion and asks that the defendant remain detained pending trial as there are no conditions or combinations of conditions that can reasonably assure the defendant's appearance and effectively assure the safety of the community. 18 U.S.C. § 3142.

As a threshold matter, the defendant does not argue that he is ineligible for pretrial detention based on the offenses charged. He is charged with 18 U.S.C. § 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon), a "crime of violence" pursuant to 18 U.S.C. § 3142(f)(1)(A), triggering a mandatory detention hearing. *See United States v. Klein*, 1:21-cr-236, ECF no. 29 at 8 and 12 (D.D.C. April 12, 2021) (Bates J.) ("The Court thus sees no reason to depart from the weight of authority concluding that § 111(b) qualifies as a 'crime of violence.'"); *see also United States v. Chrestman*, 1:21-mj-00218, ECF no. 23 (D.D.C. February 26, 2021) (Howell, C.J.). The defendant is also eligible for pretrial detention based on flight risk, 18 U.S.C. § 3142(f)(2)(A), and risk of obstruction of justice 18 U.S.C. §

3142(f)(2)(B). The government moves under all these bases for a detention hearing. The defendant should be detained pending trial for the reasons stated herein because there is no condition or combination of conditions that will ensure the appearance of the defendant at trial or safety of the community. 18 U.S.C. § 3142(e)(1).

## BACKGROUND

### 1. The Attack on the United States Capitol on January 6, 2021

Two months after the November 3, 2020 presidential election, on January 6, 2021, a joint session of the United States Congress convened at the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election. *See* Compl., Aff. Supp. Crim. Compl. & Arrest Warrant ("Aff.") ¶ 3, ECF No. 1. The joint session began at approximately 1:00 p.m. with then–Vice President Mike Pence presiding. *Id.* By 1:30 p.m., the United States House of Representatives and the United States Senate adjourned to separate chambers within the Capitol to resolve an objection raised in the joint session. *Id.* Vice President Pence continued to preside in the Senate chamber. *Id.*

As the House and Senate proceedings took place, a large crowd of protestors gathered outside the Capitol. *Id.* ¶ 4. "[T]emporary and permanent barricades were in place around the exterior of the . . . building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside." *Id.* Shortly after 2:00 p.m., a violent mob of rioters "forced entry" into the Capitol, Aff. ¶ 6, and mayhem broke out inside the building, putting an hours-long halt to the electoral vote count while elected representatives, congressional staff, and members of the press hid from the mob. *Id.* The joint session, and thus the constitutional ritual of confirming the results of the 2020 Presidential Election, "was effectively suspended until shortly after 8:00 p.m." *Id.*

2.  **Sean McHugh's Criminal Conduct on January 6, 2021**

Using investigative resources and reviewing videos from various sources taken on January 6, 2021, FBI agents identified the defendant in several videos encouraging others to engage in disruptive and disorderly conduct, assaulting law enforcement officers by encouraging and helping other rioters push a large sign into a line of officers, scuffling with an officer in an attempt to defeat a barricade, and spraying an unknown chemical into a line of officers. *Id.* ¶¶ 13, 15, and 16.

Several videos show multiple instances where McHugh is at the front of rioters encouraging the crowd with his megaphone (recovered in the search of the defendant's home) to intimidate officers and approach police lines while officers attempt to fend off rioters from breaching various barricades. For example, McHugh was seen gesturing to the crowd to advance on the police while yelling things like "Come on! Let's go!"; "Come on you guys, come on you guys! Bring it in!" *Id.* ¶ 13-14. In one video, a female voice is audible from off-camera and heard saying, "Sean, tell them to get over here." McHugh responds by using his megaphone to direct the crowd. *Id.* ¶ 19.





McHugh also verbally attacked law enforcement officers. Video captures him yelling various obscenities at officers through his megaphone like, "You guys like protecting pedophiles?"; "You're protecting communists!"; "I'd be shaking in your little shit boots too"; "There is a second amendment behind us, what are you going to do then?"; "You ain't holding the line!" *Id.* ¶ 12.

 

At approximately 1:40pm, a large group of protesters started to move a metal sign toward a police barricade. McHugh was positioned at the front of the barricade. McHugh turned around, saw the sign coming toward him and yelled into his megaphone at the officers, "Yeah bitch!"  He then directed the rioters with his megaphone to, "Put it up there! Put it up there!"  McHugh then took a position at the side of the sign, grabbed it, and pushed it into officers. *Id.* ¶ 13. Joseph Padilla (detained pretrial as discussed below) is in the blue jacket immediately to McHugh's left in the photo below:



Another publicly available video shows McHugh later scuffling with an officer in an attempt to defeat another barricade. *Id.* ¶ 15.



Still in the general area of the West Terrace, video captures McHugh deploying bear spray at officers. Other footage captures the spray bottle, which McHugh holstered at his right hip. *Id.* ¶ 16.











**3.  Arrest of McHugh and Search of his Home**

The megaphone, bear spray, and bear spray holster McHugh used at the Capitol were recovered from McHugh's residence on May 27, 2021 during the execution of a search warrant.



Although the picture below of the label is somewhat out of focus, there is a clear warning of "irreversible eye damage if sprayed in the eye" and a warning that the spray is a "Hazzard to Humans".



In the days leading up to the search, FBI Special Agents conducted surveillance of McHugh's residence and viewed him driving (alone) to and from that residence multiple times. McHugh now claims to the Court that "he does not have a valid driver's license and does not drive."  Defendant's Motion at 6.

### 4. Procedural History

On May 24, 2021, the defendant was charged by complaint with the following:

1) 18 U.S.C. § 1752(a)(1) and (b)(1)(A) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority with a Deadly or Dangerous Weapon,
2) 18 U.S.C. § 1752(a)(2) and (b)(1)(A) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon,

3) 18 U.S.C. § 1752(a)(4) and (b)(1)(A) - Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon,
4) 40 U.S.C. § 5104(e)(2)(D) - Disorderly Conduct on Capitol Grounds,
5) 40 U.S.C. § 5104(e)(2)(F) - Physical Violence on Capitol Grounds,
6) 18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder,
7) 18 U.S.C. § 111(a)(1) and (b) - Assault Law Enforcement Officer with a Deadly or Dangerous Weapon, and
8) 18 U.S.C. § 1512(c)(2) - Obstruction of Justice/Congress.

The defendant was arrested on May 27, 2021 in the Eastern District of California. He appeared before Magistrate Judge Kendall J. Newman on June 1, 2021 for a detention hearing. After hearing evidence and argument, Judge Newman ruled that the defendant was a flight risk and posed a significant danger to the community and ordered him detained pending trial. U.*S. v. Sean Michael McHugh*, Docket 2:21-MJ-89, ECF No. 4 and 6 (E.D.C.A.). He ruled specifically:

> I think that Mr. McHugh should be detained with the information I currently have as both a flight risk but especially as a danger…. This isn't the situation where the guy had a few beers and went out and did something stupid. He flew across the country and was involved in this incident and involving it with bear spray and firing up the crowd, et cetera. So that's a significant concern. *Id*. ECF Docket No. 15-1 at 16-17.

## **STANDARD OF REVIEW**

Although the D.C. Circuit has not yet specifically addressed the issue, it appears that the review of the magistrate judge's order of release is *de novo*. *United States v. Little*, 235 F. Supp. 3d 272, 277 (D.D.C. 2017); *see United States v. Chrestman*, Case No. 21-mj-218 (ZMF), 2021 U.S. Dist. LEXIS 36117 at *14–18, *14 n.5 (D.D.C. Feb. 26, 2021) (collecting cases and detailing analysis). Despite the *de novo* review, this Court can examine the lower court's findings and reasoning and may find its analysis persuasive. Finally, the reviewing Court has discretion to call witnesses, review transcripts, or proceed by proffer. *See United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam); *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021).

**LEGAL STANDARD**

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are "the most serious' compared to other federal offenses," including crimes of violence. *See United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)). Thus, a detention hearing must be held at the government's request only "in a case that involves" a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B). The BRA "requires that detention be supported by 'clear and convincing evidence' when the justification is the safety of the community." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). Even if the defendant does not pose a flight risk, danger to the community alone is sufficient reason to order pretrial detention. *Salerno*, 481 U.S. at 755.

For pretrial detention based on dangerousness, the government must prove "an arrestee presents an identified and articulable threat to an individual or the community . . . ." *Munchel*, 991 F.3d at 1280 (quoting *Salerno*, 481 U.S. at 751). "[A] defendant merely posing a danger to others and the community on January 6, 2021 is insufficient to 'warrant this exceptional treatment' of pretrial detention." *United States v. Owens*, 1:21-cr-00286, ECF No. 26 (May 28, 2021) (Howell, C.J.) (internal citations omitted). "Instead, dangerousness must be predicated on a finding that a defendant 'in fact pose[s] a threat of committing violence in the future.' *Id.* (quoting *Munchel*, 991 F.3d at 1284).

To determine whether conditions exist that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the judicial officer is

instructed by the BRA to consider four factors: (1) "the nature and the circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(l)-(4). The government must prove dangerousness by clear and convincing evidence and flight risk by a preponderance. *See* 18 U.S.C. § 3142(e)(1); *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Circ. 1996).

## ARGUMENT

Having established that the defendant is eligible for pretrial detention, the Court must next determine whether any "condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The United States submits that there are no conditions or combination of conditions the Court could impose that would reasonably assure the safety of the community or the defendant's appearance by looking to the four factors in § 3142(g)(l)-(4).

(1) <u>The Nature and Circumstances of the Offenses Charged:</u>

The Court must first consider the "nature and circumstances of the offense charged" including "whether the offense is a crime of violence." § 3142(g)(1). When considering the nature and circumstances of the offense, this Court has articulated six guideposts that assist with assessing the severity of the conduct among the hundreds of defendants who now face charges related to the events of January 6, 2021, including: (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning, "for example, by obtaining weapons or tactical gear"; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protesters before, during, or after the riot; (5) whether the defendant played any leadership role or encouraged other rioters misconduct; and (6) the

defendant's "words and movements during the riot"—e.g., whether the defendant "remained only on the grounds surrounding the Capitol", damaged property, stormed into the Capitol interior, or whether the defendant "injured, attempted to injure, or threatened to injure others." *United States v. Chrestman*, 2021 WL 765662 *8 (D.D.C. February 26, 2021) (Howell, C.J.); *see also United States v. Owens*, 1:21-cr-00286, ECF No. 26 (D.D.C. May 28, 2021) (Howell, C.J.); *United States v. Caldwell*, 2021 WL 2036667 (D.D.C. May 21, 2021) (Kollar-Kotelly, C.). McHugh fires on all six cylinders. Accordingly, the nature and circumstances of the offenses charged weighs strongly in favor of detention.

McHugh is charged with six felonies and two misdemeanors, including for offense conduct that involves the use of a dangerous weapon—namely, the bear spray and the large metal sign. The crimes alleged are serious and carry severe penalties: up to five years' imprisonment for violation of 18 U.S.C. § 231(a)(3); 20 years' imprisonment for violation of 18 U.S.C. § 111(a)(1), (b); and ten years' imprisonment for violations of 18 U.S.C. §1752(a)(1),(2), (4) and (b)(1)(A). Violent felonies, like those charged here, weigh more heavily in favor of pretrial detention. Section 3142(g)(1) specifically directs the Court to consider whether a defendant has been charged with a crime of violence. Here, McHugh openly deployed dangerous weapons while assaulting, resisting, or impeding law enforcement officers who were engaged in their duties, and he conducted these assaults in full view of many officers, fellow rioters, and cameras.

Defendant claims that the evidence is insufficient to establish that the spray came close to officers; there is no "evidence that the spray was dangerous"; and that he was not "ramming" the sign into anyone. Defendant's Motion at 4-5. Although the Bail Reform Act does not define the term "dangerous weapon," the same phrase is used in "functionally analogous contexts… such as the federal assault statutes." *United States v. Chansley*, 1:21-cr-00003, ECF Docket No. 25 (D.D.C

March 8, 2021) (Lamberth, R.). "[C]ourts have consistently defined 'dangerous weapon' as an object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm." *Id.* at 13 (collecting cases).

Clearly, a large metal sign and bear spray with a warning label stating "Hazzard to Humans … irreversible eye damage if sprayed in the eye" both qualify as inherently dangerous weapons. *See e.g. United States v. Padilla*, 1:21-cr-00214, ECF Docket No. 24 at 12 (D.D.C. May 4, 2021) (Bates, J.) ("[Padilla] forcefully … helped to successfully knock down that barricade with a large metal sign. Those actions were violent, persistent, and created a real risk of injury to others."); *United States v. Caldwell*, 2021 WL 2036667 (D.D.C. May 21, 2021) (Kollar-Kotelly, C.) (chemical spray used by defendant against officers on January 6th was a dangerous weapon warranting detention); *United States v. Owens*, 1:21-cr-00286, ECF No. 26 (May 28, 2021) (Howell, C.J.) ("In addition, defendant does not appear to have come to the Capitol prepared for conflict, but instead "dressed casually," wearing "no body armor or tactical gear," … and he brought no ***conventional dangerous weapon*** for offensive or defensive uses, such as a taser, firearm, baton, axe or ***chemical spray***.") (emphasis added).

Video evidence that will be presented during the hearing on June 25th will put defendant's claims to rest that he did not participate in pushing the large metal sign against police. Likewise, video evidence will show that at least two officers reacted adversely to being sprayed by McHugh and that he deliberately directed the spray toward law enforcement. McHugh's violent, felonious actions place him in the category of defendants that the Court of Appeals explicitly recognized as eligible for detention. *See, e.g., Munchel*, 991 F.3d at 1284 ("[T]hose who actually assaulted police officers . . . are in a different category of dangerousness than those who cheered on the violence[.]"); *see also United States v. Fairlamb*, 2021 WL 1614821, at *8 (D.D.C. April 26, 2021)

(Lamberth, R.) ("[T]he defendant's willingness to assault a police officer on January 6—in the full view of other officers, scores of bystanders, and many cameras—confirms that, when enraged, he poses a danger to the community.").

McHugh traveled to D.C. from Sacramento, California by airplane with at least two other individuals. Compl., Aff. Supp. Crim. Compl. & Arrest Warrant ("Aff.") ¶ 17, ECF No. 1. Records show that he lodged in D.C. between January 5th and January 7th. *Id.* at ¶ 22. McHugh brought to the Capitol a megaphone, bear spray, and a holster. The short travel reservation combined with the items McHugh chose to pack suggests that the defendant's *only* purpose in coming to D.C. was to participate in an anticipated violent riot. The defendant came to D.C. prepared for conflict carrying a "conventional dangerous weapon" of chemical spray for offensive use. *See Owens*, 1:21-cr-00286, at 15.

The investigation into McHugh's social media is preliminary and ongoing. McHugh's Facebook profile "Sean Mcq" was only recently identified. The profile contains references to the second amendment and the overthrowing of the constitution. Specifically, McHugh's profile features a quote sometimes attributed to Abraham Lincoln: "We the people are the rightful masters of both Congress and the Courts, not to overthrow the Constitution but to overthrow the men who pervert the Constitution." His profile also states, "Shall not be infringed! 2A spells it out clearly."



Photographs and video demonstrate that defendant McHugh was constantly at the front of the rioters, directly confronting police officers. McHugh was anything but a passive observer. He was an active aggressor who consistently used his megaphone to encourage his fellow rioters. In this way, he assumed a de facto leadership role in the assault and likely inspired further criminal conduct on the part of others. *See United States v. Chrestman*, 2021 WL 765662, 15 (D.D.C. February 26, 2021) (Howell, C.J.).

Defendant argues that the use of a megaphone alone does not suggest danger. True, but defendant fails to argue that dangerousness is not implicated despite *how* he used his megaphone.

McHugh waved on the rioters, urging them to advance on police while yelling "Come on! Let's go!"; "Come on you guys, come on you guys! Bring it in!" McHugh also harassed law enforcement officers yelling through his megaphone things like, "You guys like protecting pedophiles?"; "You're protecting communists!"; "I'd be shaking in your little shit boots too"; "There is a second amendment behind us, what are you going to do then?"; "You ain't holding the line!"  Finally, McHugh gave the rioters specific instructions as to the large metal sign that he ultimately used to push into police, screaming into his megaphone, "Yeah bitch! Put it up there! Put it up there!" *See Chrestman*, 1:21-mj-00218, at \*30 ("Nearly as significant is defendant's use of force to advance towards the Capitol and his use of words to lead and guide the mob in obstructing the police and pushing against police barriers."). Thus, the nature and circumstances of the offense strongly supports a finding that no conditions of release would protect the community

(2) <u>The Weight of Evidence Against the Person:</u>

The weight of the evidence against defendant is strong. McHugh's travel to D.C. has been confirmed through multifarious sources. McHugh's violent words and actions at the Capitol were captured on film, both body-worn camera footage and publicly available video. McHugh's bear spray, holster, and megaphone were recovered in the search of is home. He cannot dispute that these events occurred. The weight of the evidence thus strongly supports a finding that no conditions of release would protect the community.

(3) <u>History and Characteristics of the Person:</u>

McHugh was on probation for DUI and driving with a suspended license with the County of Sacramento when he attacked officers at the Capitol. For someone who is only 34, McHugh has a remarkably long and disturbing criminal history spanning back to when he presented false identification to a police officer when he was only 16. Over time, his crimes have escalated with

his first felony conviction for vehicle theft in 2006. His criminal history includes violent offenses ranging from vandalism, malicious destruction of private property, burglary, domestic violence, distribution of controlled substances, resisting arrest, and three prior rape offenses. In 2010, he was arrested and charged with "Rape: Force/Fear/Etc" and ultimately convicted of the misdemeanor of "Sex with minor + or -3 years" and "Contribute to Delinquency of a Minor."  In 2015, McHugh was arrested for "Rape: Victim Incapable of Consent" and "Sex with Minor: Perp 21+ Victim -16".  The vast majority of these offenses occurred *while* McHugh was on probation and being supervised (just like the instant offense). Prior court-ordered conditions have failed to protect the community from McHugh and have failed to dissuade the defendant from committing further crimes.

*Risk of Flight*: McHugh has at least three documented prior instances of failing to appear for Court hearings and was even charged and arrested for failure to appear. McHugh has numerous probation violations, to include at least three documented instances where he *admitted* he violated the terms of his probation. Defendant argues that he is not a risk of flight, and that his employment status and letters of support show that conditions could assure his appearance. However, the defendant's multiple prior failures to appear in Court and arrests for multiple new violations while subject to probation supervision reflect the defendant's unwillingness or inability to comply with Court orders. Even if defendant's release would *not* pose a danger to the public, the Court still must detain pending trial if the Court finds by a preponderance of the evidence that no conditions of release would mitigate his risk of flight. *See* 18 U.S.C. § 3142(e)(1); *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

The suggestion by defense counsel that McHugh was leading "a law abiding life" for five months after he attacked police at the Capitol is just wrong. Defendant's Motion at 6. McHugh

was already in violation of his probation for failing to properly conduct a monthly check-in with his probation officer. His probation officer reported to the FBI that during the check-in process McHugh was required to turn on his phone's location setting so the officer could see his location. Starting in November 2020, McHugh did not include a photograph at the time of his check-in, and the device he used to check in did not have the location setting enabled. McHugh, who has a suspended and revoked license for multiple DUIs, was observed many times by the FBI post-January 6th, driving alone (in violation of his probation) in a truck registered to his girlfriend and proposed custodian, Amy Hunt. Defendant even admits that he used alcohol two weeks prior to his arrest. Defendant's Motion at 6.



The above picture was posted by McHugh on his Facebook page. It is unclear exactly when the picture was taken, but for some period of time after his felony conviction in 2006, McHugh was a prohibited person. However, it appears, pursuant to California Penal Code 1203.4, McHugh

no longer has a felony conviction as it was reduced to a misdemeanor and dismissed. At a minimum, McHugh appeared to have access to at least one firearm.

(4) <u>Nature and Seriousness of the Danger to Community:</u>

This final factor, the nature and seriousness of the danger to any person or the community posed by a defendant's release, also weighs heavily in favor of detention. The Court must find clear and convincing evidence that the defendant "presents an identified and articulable threat to an individual or the community," *Munchel*, 991 F.3d at 1282 (quoting *Salerno*, 481 U.S. at 751). This threat must be "considered in context" regarding "the nature of the threat identified and the resources and capabilities of the defendant." *Id*. at 1283. Finally, the D.C. Circuit indicates the Court should consider the defendant's prospective danger to the community. *Id*.

The defendant was part of a violent riot at the U.S. Capitol in which law enforcement officers were injured and Congress's constitutional task of counting electoral college votes was disrupted. More significantly, the defendant's assault of police officers places him in the "different category of dangerousness than those" rioters who merely "cheered on the violence or entered the Capitol after others cleared the way," as his violent conduct puts him squarely among "those who actually assaulted police officers . . . and those who aided, conspired with, planned, or coordinated such actions." *United States v. Munchel*, No. 21-3010, 2021 WL 1149196, at *8 (D.C. Cir. Mar. 26, 2021). Here, the defendant engaged in violent criminal conduct that was planned beforehand, coordinated with others, and included the use of at least one "conventional dangerous weapon" (bear spray), in the midst of a violent mob. Therefore, "[b]ecause the defendant was among the more dangerous of the January 6 participants, he is more likely to endanger the community if released pending trial." *United States v. Fairlamb*, 2021 WL 1614821, at *6 (D.D.C. Apr. 26, 2021) (Lamberth, R.).

Moreover, the type of violence McHugh employed was plainly designed to incapacitate and/or injure law enforcement. *See United States v. Padilla*, 1:21-cr-00214, ECF Docket No. 24 at 12 (D.D.C. May 4, 2021) (Bates, J.); *see also United States v. Klein*, 1:21-cr-236, ECF no. 29 at 8 and 12 (D.D.C. April 12, 2021) (Bates J.) (detention not appropriate where the government did not submit evidence that Klein intended to injure officers). This Court precisely described conduct similar to McHugh's as indicia of dangerousness that may warrant pretrial detention. *See United States v. Owens*, 1:21-cr-00286, ECF No. 26 (D.D.C. May 28, 2021) (Howell, C.J.):

> Conduct on January 6, 2021, showing a defendant's intentionality for engaging in assaultive behavior, as evidenced by planning for, carrying and using a conventional dangerous weapon, like a taser or chemical spray, raises a much greater risk of dangerousness than bringing a skateboard. Intentional and purposeful assaultive conduct, particularly involving multiple incidents of directly provocative and aggressive, threatening actions toward police, particularly combined with verbal threats before, during or continuing after that date, are all indicia of dangerousness that may warrant pretrial detention.

Defendant claims the "allegations arising out of January 6, 2021 are a one-off." Defendant's Motion at 7. However, even though the events of January 6th have passed, the danger presented by the defendant continues. The defendant planned for violence at the Capitol, collecting the necessary equipment such as bear spray and purchasing plane tickets and hotel reservations. The day of, he was an enthusiastic, provocative, and violent participant in the riot and showed clear disregard for the safety of others and officers. He assumed an *ad hoc* leadership role, repeatedly placing himself at the front of the of the mob closest to the police lines in various locations exhorting others to join him. Taken together, these facts show the presence of the group was not critical to the defendant's assault. The defendant's violent conduct on January 6th was not aberrant or limited to the context of the day's events.

Outside the circumstances of January 6, the defendant's predilection for violent crime and

his unwillingness to be supervised establishes the real likelihood of future violence to the community and to other law enforcement officers. The defendant's extensive criminal history and pattern of probation violations illustrate a total disregard for the rule of law and is the best indicator of future behavior. *See, e.g., Maryland v. King*, 569 U.S. 435, 453 (2013) ("[A]n arrestee's past conduct is essential to an assessment of the danger he poses to the public[.]"); *United States v. Tortora*, 922 F.2d 880, 888–89 (1st Cir. 1990); *Bradley R. Johnson*, Assessing the Risk of Violence, in Psychiatric Aspects of Violence 31, 32 (Carl C. Bell ed., 2000) ("The single best predictor of violence is a history of violence."). Add that criminal history to his violent efforts to prevent the peaceful transition of power after a democratic election and the present and future danger he poses to the public is undeniably clear.

The defense argues that the cases of *United States v. Chad Jones*, 1:21-mj-076, and *United States v. Vitali Gossjankowski*, 1:21-cr-123, suggest release is appropriate. First, the United States did not seek detention in these other cases, so a full evidentiary record is undeveloped. Second, defense counsel has presented no evidence that the defendant feels any sense of remorse for his actions, a condition that has been present when this Court has revoked pretrial detention orders for similarly situated defendants. *See e.g.*, *United States v. Cua,* 2021 WL 918255, at *4 (D.D.C. Mar. 10, 2021) (Moss, R.). Third, McHugh is dangerous for reasons not present in those other cases. As far as counsel knows, these other defendants had not engaged in prior planning or coordinator with others nor had any discernible criminal or violent criminal history. Thus, the dangerousness of these two defendants appears to be limited to their conduct on January 6. Not so with McHugh.

McHugh is most closely related to fellow rioters Christopher Worrell, Joseph Padilla, and Daniel Caldwell—all detained pretrial. This Court detained Christopher Worrell pretrial when the government presented, *inter alia*, evidence that the defendant "discharged pepper spray gel

directed at a thin police line." *See United States v. Worrell,* 21-MJ-296, ECF Docket No. 13 (D.D.C. March 19, 2021) (Howell, C.J.). In a per curium opinion, the D.C. Circuit court upheld this Court's detention ruling, citing to the categorical language in the *Munchel* opinion and stating, "In contrast to the defendants in *Munchel*, as the district court here found, appellant 'actually assaulted police officers' with pepper spray gel." *United States v. Worrell*, No. 21-3020, Doc. 1897399, (D.C. Cir. May 5, 2021) (per curium).

Padilla was in close proximity to McHugh at the lower west terrace facing off against law enforcement when the large metal sign was brought up by the rioters. Both men grabbed the sign at about the same time and directed it into the barricade. Padilla also (separately from McHugh) grappled with law enforcement at a metal fence and also threw a flagpole at officers. Judge Bates ruled detention was appropriate and held, "Padilla intended to engage in violent conduct to harm others." *United States v. Padilla*, 1:21-cr-00214, ECF Docket No. 24 (D.D.C. May 4, 2021) (Bates, J.).

Caldwell brought and deployed chemical spray against multiple officers at the Capitol. The Court in *Caldwell* found that his "actions against police officers are deeply troubling, and plainly weigh in favor of the Court finding that he poses a serious danger to his community." *United States v. Caldwell*, 2021 WL 2036667 (D.D.C. May 21, 2021) (Kollar-Kotelly, C.).

Like these other three defendants, McHugh's actions on January 6 place in him in the higher danger category suggested by *Munchel*. His serious, violent criminal acts coupled with McHugh's lengthy criminal history provide clear and convincing evidence that he "poses a concrete, prospective threat to public safety." *See Munchel*, 991 F.3d at 1280. The threat posed by McHugh includes using physical violence to advance his political objectives and harming public servants carrying out orders that he views as illegitimate according to a misguided understanding

of our constitutional democracy. McHugh's conduct further establishes that he has both the "resources and capabilities" to execute that threat if the opportunity presents itself in the future. *See Id.* at 1283.

Accordingly, the defendant poses a concrete and prospective danger to the community. This Court can have <u>zero</u> confidence that any condition or combination of conditions would deter future acts of violence by this defendant.

## **DEFENDANT'S PROPOSED RELEASE PLAN**

Defendant proposes that he be released to the custody of Amy Hunt, his girlfriend of five years, who is also a felon. Ms. Hunt was convicted of Fraud to Obtain Aid (felony) on January 27, 2014 and was subject to a term of probation for three years and 180 days in jail. This conviction was only disclosed after pressing by pretrial. Pretrial also expressed concern with Ms. Hunt as a custodian because she lacked awareness regarding the defendant's recent alcohol and drug use history and his lack of participation in AA meetings. Additionally, McHugh, who does not have a license to drive, has been driving Ms. Hunt's truck on a regular basis.

Defendant and Ms. Hunt have been living together for years. They were together when McHugh decided to travel to Washington. Ms. Hunt admits in her letter of support she was not able to prevent the defendant from traveling to D.C.: "When Sean decided to go to DC, I told him not to go as I felt he was way too emotionally involved in politics as it was. It consumed his life….I was upset that he chose not to listen and go against my advice." Ms. Hunt was unable to prevent McHugh's violent actions at the Capitol even though she tried. The defendant offers no explanation as to why Ms. Hunt would now suddenly be able to control the defendant's actions.

Given all these facts, to put it mildly, Ms. Hunt's ability to monitor defendant's compliance with this Court's orders is highly questionable. Despite all this, the defendant insists

"Ms. Hunt is an appropriate third [party] custodian."  Defendant's Motion at 8. The United States joins with the pretrial office and disagrees.

## **CONCLUSION**

The defendant moves this Court to release him despite a lengthy, violent criminal history, a lengthy history of non-compliance and non-appearance, despite being on probation when he engaged in multiple acts of violence designed to injure or incapacitate law enforcement at the Capitol; and his proposed custodian is his felon girlfriend who, by her own admission, was unable to stop his travel to D.C. despite her resistance to it.

The defendant has demonstrated he is capable and willing to engage in violent behavior as well as a willingness to impede and obstruct the law enforcement in the line of duty.  Pretrial detention is necessary in this case to assure the safety of others and the community and the appearance of the defendant as required. 18 U.S.C. § 3142(f). There is clear and convincing evidence that the defendant would pose a danger to the community if released, and that no release conditions or combination of conditions would assure the safety of the community. Finally, there is probable cause that the defendant is a flight risk and would not appear at trial as required.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

*/s/ JACOB J. STRAIN*
JACOB J. STRAIN
Utah Bar No. 12680
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530